## COLEMAN vs. GLADWIN.

*Fourth District Court for San Francisco County, August, 1857.*

### SALE AND DELIVERY OF GOODS—FRAUD—ARRESTS.

Where goods sold are in the custody of the, bailee of the seller, and nothing remains

to be done to ascertain the price, quantity, quality or individuality, the sale and delivery is complete upon the giving of a delivery order upon the bailee, and an acceptance, and readiness, *and ability*, on his part to comply with it.

Where a defendant has been arrested, and the question of fraud is submitted to a jury, they may infer a *fraudulent intent*, from acts, conduct and circumstances showing that either *positive* or *constructive* fraud has been committed.

A debtor may, by a void or illegal contract, in good faith attempt to 'dispose of his property, without rendering himself amenable to the statute authorizing arrests.

This action was commenced on the 18th of June, 1857, to recover the value of certain pork sold to defendants, pursuant to a contract dated February 25th, 1857. The plaintiffs set forth in their complaint that they, at the special instance and request of defendants, sold and delivered to them, at the city of San Francisco, about the 16th day of May, 1857, two hundred barrels of pork, at the price of sixty-three hundred dollars; that the full amount of said price is fully due, and remains unpaid to plaintiffs: wherefore said plaintiffs demand judgment, etc.

For answer, the defendants deny that the sale and delivery mentioned in said complaint was completed until the 19th day of May last, and that no action accrued to plaintiffs for the price thereof until the 19th day of June, A. D. 1857; they deny that at the time of the commencement of this action they were indebted to plaintiffs in the sum of sixty-three hundred dollars, or in any other sum whatever. They aver that this action has been prematurely brought: wherefore they pray, etc.

On the 3d of July, Henry Carlton, Jr., one of the plaintiffs, made affidavit that he had been informed by his counsel to the effect that it would be necessary to amend the complaint by inserting certain allegations, (those forming the amendment to the complaint immediately following.) Upon this affidavit an order was granted commanding defendants to show cause, on the 6th day of July, why the amendment should not be permitted as above prayed for. Leave to amend was granted, after hearing argument of counsel, on the 13th of August, in pursuance of which plaintiffs filed the following amendment: "The plaintiffs for amended complaint by leave of the court for that purpose first had and obtained, aver that defendants as plaintiff is informed, and believes were, on the 3d day of July, 1857, about to depart from this State for the purpose of defrauding their creditors;

and for further amendment the plaintiffs aver that they are informed and believe, and therefore charge that the defendants had, on the 3d day of July last, removed their property for the purpose of defrauding their creditors.' The plaintiffs therefore pray, in addition to the prayer of the original complaint, for execution against the body of the defendants.

The answer of the defendants denied that they, or either of them, at or about the time of the commencement of this action, were, or at any time since have been, or are now, about to depart from this State for the purpose of defrauding their creditors. They emphatically deny any intention whatsoever on their part, or on the part of either of them, of departing from this State either at or about the time of the commencement of this action, or at any time since, or now. They deny that they, or either of them, have disposed of, or removed their property, or any part thereof, for the purpose of defrauding their creditors, or any of them.

In addition to this action there were also commenced, on the same day, against these defendants, the following, to wit: by Jackson McKenty, for $25,912,05 ; by George S. Gladwin & Co., for $13,492,33 ; by Wm. M. Lent, for $5,000 ; by U. P. Hutchings, for $2,500 ; by Garrison, Morgan, Fretz & Ralston, for $8,500 ; by H. M. Whitmore, for $4,800 ; by Sanjurjo & Co., for $7,875 ; by Flint, Peabody & Co., for $5,420 ; by W. Horr & Co., for $1,449,64 ; by J. R. Newton & Co., for $3,377,75 ; by S. C. Bigelow, for $1,000 ; by A. B. McCreary, for $9,449,55 ; by Bosworth, Masten & Co., for $600, and by Fay & Willis, for $1,695,60. On the trial it was admitted that plaintiffs compose the firm of Wm. T. Coleman & Co., and defendants that of Gladwin, Hugg & Co., and also that the latter executed the contract upon which this action is founded.

It appeared that one hundred and sixteen barrels of the pork, to recover the price of which this action is instituted, were delivered from the ship " John Milton," on the 14th of May ; twenty-seven more on the following day, and fifty-five on the 16th, making one hundred and ninety-eight barrels out of the whole two hundred ; the remaining two barrels of which were not delivered until the 19th. The delivery order on the clerk of the ship, dated May 8th, and accepted by him on the 14th, was put in evidence. One hundred and eighty-seven

barrels went to Alsop & Co.'s warehouse, on account of J. D. Teller, who had loaned upon it $4000, while the remainder, being out of order, were sent to the store of defendants.

On the 4th of June, defendants borrowed $2,500 of U. P. Hutchings, of the firm of Sweetzer, Hutchings & Co., giving therefor two notes of $1,250 each, at two and a half per cent. per month, which sum fell due on the 19th. On the 18th, Hutchings received a demand note for the whole debt of $2,500, at the same time returning the two original notes, and attached the stock of defendants, but this being in order the fifth attachment, was worthless. It had always been understood that in case of difficulty Hutchings was to be secured; and in pursuance of that understanding he received from defendants on the 1st of July a note of a Stockton house, endorsed by defendants, for $2,300, due about the 10th of August. The defendant Gladwin lived with Hutchings; yet the latter, although aware that they were in want of money, had no idea that they were about to fail until June 18th, when Gladwin told him to go and secure himself by attachment. Joseph H. Goodman, the salesman of the defendants, bought from them on the account of his brother at Napa, one hundred and twenty-seven barrels of the pork, out of which this action originated, on the 11th of June, for $6,634,22, which pork was then removed from Alsop & Co.'s, and stored, a portion in the North Point warehouse, and the remainder in Crowell's warehouse. The entry of this sale, however, was not made until July 3d, being fifteen days after their failure. At the same time several other entries were made, among which was a payment of $3,136 to W. H. Sitten, hereafter more particularly mentioned. About the 24th of June, G. H. Davis purchased of Goodman twelve barrels of mess pork, the location of which Goodman refused to give. The latter at the same time offered to sell Davis for other parties a large amount of Billings' hams, lard, cheese, and American hams. This offer, Goodman testified, was made merely by way of a joke, for he had not the goods, nor had he any prospect of getting them. Ten more barrels of this mess pork were sold by Goodman on the next day to Moses Ellis, who also bought from him, about the 1st of July, certain Billings' hams to the amount of. $800. On the same day, G. R. Whitney bought $180 of hams of Goodman, which were delivered by the latter at the boat free of charge,

Coleman *vs.* Gladwin.

Goodman was aware, on the 13th of June, the day on which a rough account of stock was taken, that defendants would be obliged to fail. On that day defendant Gladwin, during a ride with P. T. Southworth, informed that gentleman that he was in want of money, and offered to sell him for $2,200 a certain lot on Kearny street, upon which one L. E. Ritter held a mortgage for $12,000, which was bearing interest at the rate of one and a half per cent. per month. Southworth bought the lot and building, and purchased at the same time Gladwin's horse, buggy and harness for $800, making a total of $3,000, which he paid on the 17th. On the 4th of June, Southworth loaned $2,000 to defendants, taking their endorsement on a check. Gladwin promising to protect him in case of difficulty, this sum was not deducted from the $3,000 paid for the land, etc. On the 16th of June he received one hundred barrels of sugar, worth about $3,275, with orders to sell at the best price that he could get, and made an advance thereon of $2,500, all over which was to be retained in part payment of the debt of $2,000. On June 23d he received for the sugar $3,278,66 ; paid for storage, $18,75, and for cartage, $12,50, leaving $747,41 above his advance. On the 28th five bills-receivable were placed in his hands, to wit. :

A note of Eckman, Tennant & Co., for $497,00 due July 3d.
A note of Hamilton & Co., for . . 478,40 due June25th.
A note of S. L. Dewey, for . . . . . 645,30 due July 3d.
A note of Garretson & Bell, for . . 500,00 due July 16th.
A note of John Allen, for . . . . 526,26 due July 1st.
   Total, . . . . . . . . .            $2,646,96

The money upon these notes was all received. Upon the delivery of them to Southworth, he gave eleven checks to the employés of Gladwin, Hugg & Co., as follows, to wit. :

One to E. Palachi, for . $22,50
One to W. G. Smith, for 20,00
One to W. B. Gladwin, for 343,69
One to L. C. Mills, for 66,62
One to G. R. Smith, for 150,73
One to Russell Davis, for 340,00

One to W. Grant, for . . 140,09
One to S. B. Brabbs, for 297,50
One to B. Kelly, for . . 624,00
One to W. A. Piper, for 425,00
One to A. Coffin, for . . 166,00
            $2,596,13

—leaving to the credit of Gladwin, Hugg & Co., $50,78, which the interest account would absorb.

On the 18th of June, he received a note of Stewart & Co., for $1,284,55, which, with the surplus on sugar, ($747,41,) left to the credit of defendants after the payment of the $2,000, the sum of $31,96. E. W. Washburn, on the 8th of June, advanced defendants $2,000 on certain sugars and coffee, and on the 10th, $2,000 more. These goods had previously been hypothecated to Alsop & Co., for $9,800. On the 13th of June, he sold these sugars and coffee for $11,560,51. There was then due Alsop & Co. $9,823,60, leaving a balance of $1,736,91 in Washburn's hands, and defendants' debt to him, $2,263,09. On June 17th, he sold butter for them to the amount of $1,298,00, leaving still due him $965,09. On the 25th of June, Gladwin gave him two notes, one of L. G. Root, dated June 15th, at thirty days, for $636, and one of N. S. Root for $350, dated June 16th, at sixty days, bearing interest at the rate of two and a half per cent. per month. About the 10th of June, defendant Hugg informed J. G. Pope, in a casual conversation, that their firm was solvent; that in the latter part of May an account of stock had been taken, and that then the stock was sufficient to pay all their debts, saying nothing about what was thereby due other parties, or that the sum due defendants on book-accounts was sufficient to meet all their own liabilities, leaving their stock clear.

On the 8th of June, Hugg purchased of Flint, Peabody & Co. twenty-two tierces of hams, and twenty-five barrels of syrup, amounting to $5,700, credit being to July 19th. At the time of this purchase defendant Hugg stated to Wm. H. Kellogg, of said firm, that Gladwin, Hugg & Co. were then in a perfectly sound and solvent condition.

Macondray & Co. sold to defendants, on the 25th of April, teas, of the value of $11,606,55, payable on June 4th, with privilege of extending one half fifteen days from that date and the other half thirty days. Afterwards, and before their failure, sold them other tea, worth $112,50. No part of this debt was paid, nor had legal proceedings for the recovery thereof been instituted. At the time of their failure defendants were also owing Macondray & Co. $10,000, bearing interest at the rate of two per cent. per month, advanced upon goods

pledged. Gladwin sold a rockaway, buggy, and double and single harness to Henry Casebolt, on the 12th of June, for $375, for which the latter gave a note payable in thirty days with interest at two and a half per cent. after date.

S. Price held a note of defendants for $1,000 given by McKenty as collateral security for $2,500, borrowed by him on the 19th of May; this note fell due on the 18th of June, and was taken up by McKenty then. At the time of the failure, H. M. Whitmore held two demand notes of defendants for $1,000 each, dated June 4th, and bearing interest at the rate of two per cent. per month. On the same date he made an accommodation endorsement for defendants for $3,000 on their note due July 3d. On the 18th of June he received a demand note for $4,800, ($200 being omitted by mistake,) on which he attached, ante-dated to June 4th, and bearing two per cent. interest. None of the interest on the two demand notes of the defendants held by him was paid. When the note for $4,800 was given, these two notes were delivered up. When the note for $3,000 fell due he took it up. On the 1st of July he received from defendant Gladwin seven cases of hams, which had not been attached, worth $974,40, which, at the suggestion of the latter, he turned over to Goodman for sale. E. Balley sold defendants, on June 9th, two hundred chests of tea, valued at $2,500, at credit of thirty and forty-five days. This tea was in their store at the time of their failure, and was attached with their other property then there.

On the 17th of February, 1857, defendants made a contract with W. Newell for the purchase of fifty cases of lard, to arrive per ship " Comet," at twenty cents per pound. This contract was assigned to McKenty, on the 18th of June, for $1. The " Comet " arrived soon afterwards, and McKenty took the lard, which was worth twenty-five cents per pound, and made about $275 out of it. Wm. M. Lent was an accommodation endorser on a note of defendants for $5,000, due on the 18th of June, and held by Sparrow, Teackle & Co., which note he took up when due. On that day he received a note from defendants, corresponding in amount, date and interest with the one which he endorsed, upon which note he then attached. His being in order the fourth attachment, was worthless; wherefore he received from defendant Gladwin, on the 1st of July, $4,558,43 in cash. On

the 18th of June, McKenty and J. Clement exchanged notes for $4,558,43, bearing date on that day, payable August 17th a 20th, at two per cent per month, each to order of maker. E. V. Thompkins bought Clement's note of Gladwin, Hugg & Co. on the 1st of July, giving therefor two checks payable to cash or bearer. He then sold this note to E. Teackle on the next day, taking therefor his check, on which the money was duly drawn. Clement took up his note on the 17th of August, by depositing that of McKenty, for which it was originally given in exchange. McKenty then secured Teackle by giving him a lien on his (McKenty's) attachment.

Defendants, at the time of their failure, owed A. B. McCreary $9,400, for the whole of which amount he attached and garnisheed as follows, to wit.: 100½ barrels of pork, delivered on the 17th of April, and 100½ more delivered on May 18th. One Himmelman held 1,075 boxes of candles of Gladwin, Hugg & Co., at twenty pounds per box, and 185 boxes at thirty-four each, which were then worth 22½ cents per pound, being $6,252,75, on which he had advanced them $6,000. McCreary paid the advance and had the goods transferred to him. On the 10th of June defendants bought ten cases of tobacco of J. Franck, at thirty-four cents per pound, amounting to $722. This was in their store at the time of the failure; was attached, and then replevied by Franck.

Wm. H. Dow sold defendants, on the 5th of June, candles, to the amount of $2,400. These were soon afterwards hypothecated to one Luning, for about $2,000. On the 12th of the same month B. G. Whiting loaned defendants $500, which Gladwin paid on the 19th. At the time of their failure defendants were indebted to Wm. H. Sitten in the sum of $3,160, which they paid on the 19th of June, by two notes, one of Geo. S. Gladwin & Co., for $2,500, bearing date on that day; the other being note of ——— ———, dated about June 15th, for $635. Defendants also owed M. F. Truett $2,700; $2,000 of which they paid on June 19th, as follows: a note of Flagg, Powers & Culver, for $1,044,44; one of Scott, Vantine & Co., for $834,97, and the balance, $120,89, in cash. On the 4th of May, Alsop & Co. advanced defendants $6,000 on coffee; on the 6th, $6,500 on candles, (a portion of which goods, as already stated, were sold by E. W. Washburn on the 13th of June,) and on the 18th, $13,500 on pork

and hams—all the loans bearing two and one half per cent. interest. On the 11th of June, defendants bought a considerable amount of sugars, on a credit of thirty days on endorsed paper; Geo. S. Gladwin was an endorser to the amount of $4,000. At the time of the failure, defendants had paper in the bank of Drexel, Sather & Church to the amount of about $28,000, deposited principally by merchants. At the same date, Wm. A. Dana held a note of theirs' for $2,965,67, dated May 19th, and due June 19th, bearing interest at the rate of two and three-fourths per cent., and endorsed by Geo. S. Gladwin. Also, a note for $1,100, secured by merchandise. When the first note fell due Geo. S. Gladwin paid it. They were also indebted to Chas. F. Lippman in the sum of $8,000 — $5,000 secured by certain syrups, pledged; the remainder represented by a note for $3,025,50, endorsed by Geo. S. Gladwin and J. McKenty. The note was taken up at maturity by Geo. S. Gladwin. On the 17th of June, defendant Hugg wrote to Robert G. Hanna, of Stockton, to whom they owed $4,955,43 on a promissory note dated May 13th, at thirty days, bearing interest at two per cent. per month, informing him that they must fail, and advising him to secure himself, which he did by garnisheeing the following persons, whose names and the amounts of whose indebtedness were furnished by Hugg in the letter referred to:

| | |
|---|---:|
| W. B. Topee, . . . . . . . | $1,269,68 |
| Matthews & Sanderson, . . . . . | 413,50 |
| J. C. Sheppard, . . . . . . | 785,00 |
| B. McKee, . . . . . . . | 542,00 |
| J. M. Buffington, . . . . . . | 240,00 |
| H. S. Stone, . . . . . . | 210,00 |
| | $3,460,18 |

Of this he succeeded in collecting $3,293,70. On the 21st Hugg gave him a note of Elliott & Co. for $437,74, and one of Stephens for $1,269, making $5,000,44, a little less than the debt and interest. On the 18th of June, Jackson McKenty attached for $25,912,05 on a note made on the 16th, given as security for various notes on which he was an endorser, and for various other debts due him. The

notes upon which he had endorsed bore interest after maturity. The first transaction upon which any of this indebtedness arose, was the sale to defendants of eighty-five barrels of Billings' hams, on the 16th of May, payable June the 4th, for which McKenty took a note for $4,241,66 ; on the 4th of June he took another for $4,218,66, payable July 3d, the difference in the amounts being on account of an overcharge of one hundred pounds. Next was on account of a loan made on May 19th, of one hundred barrels of Billings' hams to defendants for the purpose of hypothecation, which he afterwards sold them for $5,082,21. On the same day he endorsed a note of defendants' for $5,000, which he paid at maturity, on the 19th of June. The remaining indebtedness of $11,611,18, was incurred partly by sales of merchandise, and partly by endorsements on defendants' paper. Subsequent to the failure on the 18th of June, defendant Hugg loaned McKenty a note of Moses Ellis, for $1,100 ; a note of Elliot & Co., for $450, a note of H. McKenty, for $350, and $2,658,43 in cash. The indebtedness to Geo. S. Gladwin & Co. of $13,492,33, was incurred in the same manner as that of McKenty : that is, by accommodation endorsements, merchandise sold, and money lent.

Defendants' loans with Parrott & Co. averaged about $15,000 per month, principally on the paper of other merchants. At the time of the failure they were indebted to this house $8,750, of which, since the 18th of June, $2,000 was paid, leaving their debt still $6,750. Their stock in store was valued at about $53,000, and sold at sheriff's sale for $43,000. They had about $130,000 worth of goods on storage, which was all pledged, and also $55,000 worth to arrive. Their losses appear to have been about $22,000 by bad debts during the last fifteen months ; $3,500 by the failure of Earl & Co., and about $9,000 on liquors, six or eight months before their failure. Their business transactions amounted on an average to $100,000 per month. Their loans and discounts were about $57,500 for the same period, at an average interest of two and five-eighths per cent.

The bond of Geo. E. Morgan, Esq., clerk in the U. S. Branch Mint, was put in evidence, in which defendants severally justified, on the 22d of May, in the sum of $5,000.

Their schedules in insolvency filed on the third day of July were

also introduced, in which, among the items of indebtedness of the petitioners, occur the following, to wit:

| | |
|---|---:|
| Wm. M. Lent, | $5,125,00 |
| Geo. S. Gladwin, | 13,492,20 |
| U. P. Hutchings, | 2,555,00 |
| H. M. Whitmore, | 4,883,00 |
| R. G. Hanna, | 4,955,43 |
| | $31,010,63 |

Of which, as has already been stated, about $15,350 in round numbers, had been paid. Their total liabilities, as set forth in these schedules, amounted in round numbers to $174,250 ; their total assets to $91,000. Defendants claimed that this omission in their schedules was accidental, and offered some testimony in that regard.

In the course of the trial, defendants offered to prove by W. H. Hontoon, an experienced and expert book-keeper, that he had examined the books of Gladwin, Hugg & Co. ; that he found that they had been improperly kept ; that, in his opinion, the party who kept the books, by his manner of keeping them, grossly deceived his employers ; that he found various errors in these books, which he can point out in the books themselves ; that all these errors are, without a single exception, against Gladwin, Hugg & Co. ; that he finds many forced balances, and also an error of $14,000 in an account of stock taken January, 1857 ; that all these entries are in the handwriting of one Allen, a former book-keeper and cashier of Gladwin, Hugg & Co. ; that this proof is offered in reference to all the books, but especially as to the memorandum sales book and large sales book ; also, as to the city ledger, and as to the book containing the accounts of stock ; that the period embraced by these entries is the whole time Allen was with defendants, and that Allen was their book-keeper and cashier. Which offer the court overruled, stating that defendants were at liberty to introduce the books themselves, but that, they not being in evidence, parol proof their contents, or of conclusions deduced from their contents, were inadmissible.

*Cook & Fenner*, for plaintiffs.

*McAllister* and *Lake*, for defendants.

Coleman *vs.* Gladwin.

Defendants requested the following instruction, which was given:

In order to convict the defendants of having removed or disposed of their property, or of having been about to do so, with intent to defraud their creditors, the jury must find that such acts of disposal, or removal, were for the purpose of, and with the intent to, defraud the plaintiffs of the demand, to recover which this action is brought.

At the request of plaintiffs the following was also given:

If the jury believe that the defendants have removed, or disposed of, *any* of their property, with the intent to defraud their creditors, they must find affirmatively upon the second issue submitted to them.

HAGER, J., in substance charged the jury,

This action is brought to recover the price of a quantity of pork alleged to have been sold and delivered by plaintiffs to defendants.

As evidence of the bargain and sale, plaintiffs have produced and proven the written contract of February 25, 1857, between the parties, in which is specified two hundred barrels of mess pork, to arrive on the ship John Milton, at $31 10. Defendants to receive it at ship's tackles, when ready for delivery from said ship, and pay for it in thirty days from delivery. And as further evidence, plaintiffs have proven the delivery order of May 8, 1857, from D. L. Ross & Co., on the commander of the ship John Milton, for two hundred barrels of pork, which is endorsed by plaintiffs to defendants, and by them in blank. It is proven that the ship John Milton arrived here about the 6th of May, and that D. L. Ross & Co. were the consignees; that the delivery order was presented to the clerk of the ship about the 14th of May, by Mr. Teller, who then held it, the pork having been transferred to him as collateral security for money loaned, and one hundred and eighty-seven barrels of it went into the warehouse of Alsop & Co., on account of Teller, and the balance being in bad condition, went to the store of the defendants. The ship commenced discharging about the 8th of May, and finished about the 27th of the same month. The delivery of these goods commenced on the 13th, and continued to the 16th of May, when all were delivered and received under the order mentioned, excepting two barrels, which were received on the 19th of May. It does not appear that delivery was either claimed or refused at any time prior to the day it was made, or that any lien or claim against the goods was made or existed after the delivery order was given.

They were in the hands of the carrier, having arrived here about the 6th of May, and upon the order being presented to him, he accepted it, and on the same day commenced the delivery. Previous to this the title to the goods had been transferred, and after the carrier attorned to the order, he became the bailee of the owner of the goods, and ceased to be the bailee of the seller. Nothing remained to be done by the seller to complete the sale or delivery.

Ordinarily, upon the sale or goods, when they are in the hands of a third party, as keeper, and nothing remains to be done to ascertain the price quantity, quality, or individuality, the sale and delivery is complete upon the giving of a delivery order upon the third party, and an acceptance and readiness, and ability on his part to comply with it.

Now it is claimed by defendants that they had the whole of the 18th of June, the day of the failure, and the day this suit was instituted, for payment, as that was the 30th day after the receipt of the two hundred barrels, on the 19th of May. But if you find the testimony as I have stated, I instruct you that the delivery was complete thirty days before this action was instituted, and that it was not prematurely brought.

It remains for you to determine the amount due, which, in this case, there being no reclamation, is a mere matter of calculation.

The next, and more important, issue for you to pass upon, is, have the defendants, as alleged, removed or disposed of their property, with intent to defraud their creditors, and among them these plaintiffs? The constitution of this State abolishes imprisonment for debt, except in cases of fraud. Under this provision of the constitution the legislature have passed certain laws, authorizing arrests in specified cases; or rather, it is defined by statute what facts shall be established by affidavits, in order to have a defendant arrested on the ground of fraud.

Among others it is provided that, when the debtor has removed or disposed of his property, with the intent to defraud his creditors, he may be arrested. The defendants having been arrested in this action, this question of fraud is submitted to you to be passed upon, to ascertain whether the judgment, if any there be, shall be enforced against the bodies of defendants.

It may be important to give you some instructions as to the legal meaning of fraud. At common law fraud is divided into positive, or

actual fraud, and what is termed constructive fraud. Positive fraud is defined to be the intentional and successful employment of any cunning, deception, or artifice, used to circumvent, cheat, or defraud another. By *constructive fraud*, is meant such an act, which, though not originating in any evil design, or contrivance to perpetrate a positive fraud, or injury, upon other persons, yet, by its tendency to mislead or deceive them, or to violate public or private confidence, or some special trust; or to injure the public interests, or to operate substantially as a fraud upon private rights, interests, duties, or intentions, is deemed reprehensible, like positive fraud, and therefore prohibited by law. Now, under our insolvent laws, as interpreted by the Supreme Court, any assignment made by an insolvent debtor, contrary to its provisions, is declared void.

An insolvent may make an assignment, in order to prefer certain creditors, which, if it contravenes the insolvent law, may be void; yet he may have acted in good faith, and with no intent to defraud his creditors, and may not, by reason of that act alone, commit a fraud which would render him liable to an arrest. In other words, he may do an unlawful or void act, without committing a fraud within the meaning of fraud, as defined by statute, under the provisions of the constitution referred to. So a person may make a sale of personal property, without a delivery, or change of the possession, which is, by law, declared void, as to creditors, and yet it may be done in good faith, on the part of the buyer and seller, and without fraud. The *intent* of the party is the material thing to be ascertained.

If a debtor disposes of his property in good faith, with no intent to defraud, the contract may be illegal, or void, yet he may not render himself amenable to our statutes authorizing arrests.

The court then referred to the facts and circumstances in evidence, relied upon as badges, or *indicia*, of fraud, and explained to the jury that it was their province to pass upon them, and ascertain whether or no they were satisfactorily explained by the testimony; that it was for them to determine the *intent* with which defendants had acted. Were the acts relied upon as evidence of fraud, for instance, the disposition of a portion of their property, done in good faith, with honest intentions, to protect, secure, or pay certain creditors, or for the purpose of

committing a *positive*, or *constructive* fraud, as I have defined these, and to defraud their creditors, and among them these defendants ?

Now, in coming to a conclusion on these important questions, and in carefully weighing and considering the very voluminous testimony which has been adduced, you must remember that it is not an easy matter, in all cases, *to prove actual fraud*, even if it has been committed. It is not a fact of itself that can be established by positive or direct evidence—a thing that witnesses can come forward and swear to, as they can to an actual, material occurrence, which is an object of the senses. Fraud is an intention—a purpose—a thought—perhaps not avowed, but concealed within the secret recesses of the heart. It is rather to be inferred from acts, conduct, and circumstances, than proven as a fact. Witnesses can lay before you facts, conduct, and circumstances ; they may be of the opinion that they constitute fraud, but you may come to a different conclusion. Fraud is a conclusion that it is always painful to draw. In a commercial community, from habit and custom, credit seems to be necessary to its existence and prosperity, and good faith is an essential element of credit ; a charge of this nature, preferred against prominent merchants, men who, you have been told, stood in the very first rank in regard to their credit, capacity, and extensive business transactions, merits at your hands the most attentive consideration, and patient investigation ; this is due to the defendants, whose characters and reputations are involved, and to the creditors and the mercantile community, whose interests may be affected.

In regard to the facts of the case, you are the sole judges ; you may credit or discredit testimony as your judgment of its value, and your estimation of the witnesses, may dictate. If you find the positive testimony contradictory, and are unable to harmonize it, you can take into consideration the testimony as to circumstances and presumptions, and find as the weight of evidence may preponderate, and according to the reasonable probability of truth. It is sufficient, as a general rule, if the evidence on the whole supports the hypothesis which it is adduced to prove—and this applies to the defendants as well as the plaintiffs.

In deciding upon the important issues submitted to you, and in the performance of your duties, in arriving at a correct conclusion, you should be guided solely by the testimony. Personal feelings, impres-

cions received outside the evidence, or the judgment that follows your verdict, you should not allow to influence your minds, or to be taken into consideration. Yours is a duty, of itself, to render a true verdict, as your oath runs, according to evidence, and it matters not who may be the parties to be affected, or what relations you bear to them, what may be the consequences of your verdict to either plaintiffs or defendants, or what you may have heard or read, either in favor of or against defendants; you should banish all such considerations from your minds, and pronounce solely upon the testimony, fairly and honestly, according to the dictates of your consciences. If jurors act otherwise, and permit private feeling, or outside rumor, to sway or control them, in finding a verdict, we might as well abrogate all laws, and close our courts of justice.

The jury gave a verdict in favor of plaintiffs for $6,800, and in reply to the question, "have the defendants, as alleged, removed and disposed of their property, with intent to defraud their creditors, and the plaintiffs among them?" they returned an affirmative answer.